IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| J.K.R., a minor, by and through his father, JOSEPH REESE, and his mother, WENDY REESE and G.S.T., a minor, by and through his father, JEFFREY THRONEBERRY and his mother, TIFFANY THRONEBERRY, <br><br> Plaintiffs, <br><br> v. <br><br> WILSON COUNTY SCHOOL DISTRICT and DONNA WRIGHT, individually and in her official capacity as Director Of Schools for Wilson County School District, <br><br> Defendants. | Civ. No. 3:20-cv-00645 <br> Hon. Aleta Trauger <br><br> JURY DEMANDED |

**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Defendants respond to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF 5).

**I.    INTRODUCTION**

Plaintiffs sent a Snapchat[1] video to a fellow student in which Plaintiffs stated: "N*****… N*****… Fuck… N*****s… Make them pick our cotton."  A copy of this video will be submitted to the Court for viewing and verification. This offensive, violent, and hurtful video was sent to another student who was abhorred by the content.  Whether Plaintiffs intended or not, this video

---

[1] "Snapchat is both a messaging platform and a social network" that "exists only as a mobile app you can download to your iPhone or Android smartphone." Snapchat "[p]hotos and videos essentially disappear a few seconds after they've been viewed by their recipients" unlike "other social networks, which keep your content online forever unless you decide to delete it." *State v. Johnson*, 538 S.W.3d 32, 42 (Tenn. Crim. App. 2017).  However, as evidenced by this case, recipients may "screen shot record" the Snapchat and thus preserve it and/or pass it on.

circulated amongst other students and created a volatile and disruptive situation within the District, which cannot be tolerated. Furthermore, Plaintiffs knew or should have known that videos posted and sent on an internet platform may be shared. Screen shot recording a Snapchat video is well known and should have been reasonably apparent to Plaintiffs.

Parents complained to the administration about the racial slurs expressed in the video as it circulated amongst social media. The video racial slurs necessitated several team meetings with the Football Coach, and ultimately intervention by the administration to address the hostile environment created by the video. The reckless posting of a video that states "N*****… N*****… Fuck …N*****s…We will make them pick our cotton" can reasonably be construed as creating a hostile school environment and violates the student conduct policy. Furthermore, the "Fuck… N*****s" statement can be perceived as violent or a potential threat of violence. Ultimately, the administration determined that Plaintiffs should be barred from extracurricular activities for the 2020-21 school year, namely playing football.

Plaintiffs assert they have a First Amendment right to send a Snapchat stating "N*****… N*****…Fuck… N*****s…We will make them pick our cotton" to another student because the video was sent away from school – i.e. off campus. The District has the duty to prevent disturbances. Although forecasting disruption is unmistakably difficult to do, it is not a stretch to conclude that the video posted by Plaintiffs would be viewed as harassing to some, offensive to most, and could lead to disruption on Plaintiffs' football team and potential conflict among students. The District took quick action to protect the students and teachers, which included conducting an investigation, holding multiple meetings with the football team to discuss players' concerns and to educate them on racism, and ultimately barring Plaintiffs from participating in extracurricular activities for one year. All of this was a disruption to the school and the football

team. In light of this, the issue should be framed as whether Plaintiffs have a constitutional right to remain on the football team after sending hateful speech to another student that, after being circulated amongst the school, caused significant disruption within the school community. The answer is no.

Because Plaintiffs cannot establish that they are likely to succeed on the merits of their constitutional claims, this Court should deny his request for a temporary injunction.

## II. STANDARD FOR RULING ON MOTION FOR PRELIMINARY INJUNCTION

This Court previously outlined the factors to be considered in ruling on a motion for a preliminary injunction.

> This Court must consider four factors in deciding whether to issue a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable harm without the injunction; (3) whether issuance of the injunction would cause substantial harms to others; and (4) whether the public interest would be served by issuance of the injunction. No single factor is a prerequisite to the issuance of a preliminary injunction; rather the Court must balance all four factors. Before a preliminary injunction may issue, however, a plaintiff must always demonstrate some irreparable injury that necessitates the injunction.

*Young v. Giles Cty. Bd. of Educ.*, 181 F. Supp. 3d 459, 462–63 (M.D. Tenn. 2015)(citations omitted).

"Each of these factors [should] be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014)(internal quotation omitted, alteration in original)(citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)). "In the context of a First Amendment claim, the balancing of these factors is skewed toward an emphasis on the first factor." *Id*. The Sixth Circuit explained this as follows:

> When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor. With regard to the factor of irreparable injury, for example, it

is well-settled that "loss of First Amendment freedoms ... unquestionably constitutes irreparable injury."

*Goodman*, 748 F.3d at 690 (quotations omitted). The *Goodman* Court further explained the importance of the first factor—success on the merits:

> In cases implicating the First Amendment, the other three factors often hinge on this first factor. "[T]he determination of where the public interest lies [ ] is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 288 (internal quotation marks omitted). Similarly, "because the questions of harm to the parties and the public interest generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the crucial inquiry often is, and will be in this case, whether the statute at issue is likely to be found constitutional." *Id.* (citing *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir.1991)). Therefore, as Plaintiffs have asserted a deprivation of the First Amendment right to free speech, this Court's emphasis is on Plaintiffs' likelihood of success on the merits.

*Id.*

*Tinker* allows schools to discipline students for their conduct "in class or out of it, which for any reason materially disrupts classwork or involves substantial disorder or invasion of the rights of others." Tinker, as set forth below, weighing the four factors with an emphasis on likelihood of success on the merits of Plaintiffs' First Amendment challenge mandates denying Plaintiffs' motion for a preliminary injunction.

### III. ANALYSIS

#### A. Likelihood of Success on Merits

The issue raised by Plaintiffs is whether the school has authority to regulate an off-campus Snapchat message that contained racial slurs. As pointed out by Plaintiffs, the starting point for this analysis is the Supreme Court decision in *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503 (1969). *Tinker* involved students wearing armbands designed to protest the Vietnam war. The Supreme Court held in *Tinker* that "First Amendment rights, applied in light

of the special characteristics of the school environment, are available to teachers and students." Teachers and students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* However, "school officials retain some authority consistent with fundamental constitutional safeguards to prescribe and control conduct in the schools." *Nixon v. Hardin Cty. Bd. of Educ.*, 988 F.Supp.2d 826, 833, (W.D.Tenn.2013) *citing Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 331 (6th Cir. 2010). "The constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings, and the Constitution does not compel school officials to surrender control of the American public school system to public school students." *Id.*

Neither the United States Supreme Court nor the U.S. Sixth Circuit Court of Appeals have ruled on the issue whether schools may regulate off-campus online speech by students in light of *Tinker* and its progeny. *Nixon v. Hardin Cty. Bd. of Educ.*, 988 F.Supp.2d 826, 836 (W.D.Tenn.2013) citing *Yoder v. Univ. of Louisville*, 526 Fed.Appx. 537, 545 (6th Cir. 2013) (noting that neither the Supreme Court nor the Sixth Circuit have ruled on the subject), *cert. denied*, 571 U.S. 1094, 134 S.Ct. 790, 187 L.Ed.2d 594 (2013). The Circuits that have weighed in on this issue first address whether off-campus speech can be considered "school speech" and thus susceptible to regulation. If the off-campus speech is "school speech," courts will then apply *Tinker* to evaluate the constitutionality of the school's imposition of discipline.

1. The Snapchat Message Was "School Speech"

As stated above, the Sixth Circuit has not addressed when off-campus speech can be considered "school speech." The Second, Fourth, Fifth, Seventh, Eighth, and Ninth Circuits have all concluded that some off-campus speech can be regulated under the *Tinker* standard. *See, e.g., Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379 (5th Cir. 2015); *Wynar v. Douglas Cty. Sch. Dist.*,

728 F.3d 1062 (9th Cir. 2013); *S.J.W. ex rel. Wilson v. Lee's Summit Sch. Dist.*, 696 F.3d 771 (8th Cir. 2012); *Kowalski v. Berkeley Cty. Schs.*, 652 F.3d 565 (4th Cir. 2011); *Doninger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008); *Boucher v. Bd. of the Sch. Dist. of Greenfield*, 134 F.3d 821 (7th Cir. 1998). As the Third Circuit put it, "*Tinker's* 'schoolhouse gate' is not constructed solely of the bricks and mortar surrounding the school yard." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 216 (3d Cir. 2011). The courts often point to the ubiquitous, "everywhere at once" nature of the Internet as justification for expanding the scope of *Tinker*. *See, e.g., Bell*, 799 F.3d at 392 (noting that the ubiquity of the Internet "confound[s] previously delineated boundaries of permissible regulations."). The two primary tests discussed by our sister circuits are the "reasonable foreseeability" test and the "Nexus" test.

  a. *The "Reasonable Foreseeability" Test*

The Reasonable Foreseeability Test arises from *S.J.W. ex rel. Wilson v. Lee's Summit Sch. Dist.*, 696 F.3d 771 (8th Cir. 2012). In *S.J.W.*, the Eighth Circuit applied a test asking whether it was "reasonably foreseeable" that off-campus speech would reach the school. 696 F.3d at 777. In *S.J.W.*, two students created a blog with racist content as well as sexually degrading comments about specifically identified female classmates. *Id.* at 773. The two students used a Dutch domain site to prevent anyone from finding their blog using a Google search and told only six school friends about their blog. They intended the blog to be a secret, but "whether by accident or intention, word spread quickly." *Id.* at 774. The *S.J.W.* court found that it was reasonably foreseeable that the blog might reach the school because it "targeted" the school. *Id.* at 778. Similarly, the Ninth Circuit has found that it is reasonably foreseeable for speech made by students about other students to reach a school. *Wynar*, 728 F.3d at 1069.

Another application of the Reasonable Foreseeability Test can be found in *Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379 (5th Cir. 2015). In *Bell*, a high school student (off-campus and without using any school resources) posted a rap recording containing violent and threatening language against two high school teachers/coaches on Facebook and YouTube. Both the Facebook and YouTube accounts were publicly accessible. *Id.* at 382. The school interpreted the language as threatening, harassing, and intimidating the teachers. The school took disciplinary action against Bell. Bell brought action against the school, claiming the school's actions violated his First Amendment rights. *Id.* After examining *Tinker* and its progeny, the Fifth Circuit found *Tinker* governs the analysis "when a student intentionally directs at the school community speech reasonably understood by school officials to threaten, harass, and intimidate a teacher, even when such speech originated, and was disseminated, off-campus without the use of school resources." *Id*. at 396.

    b. The "Nexus" Test

This test is derived from *Kowalski v. Berkeley Cty. Schs.*, 652 F.3d 565 (4th Cir. 2011). In *Kowalski*, a student created a MySpace discussion group where she and over two dozen other students ridiculed a fellow student as a "whore" infected with herpes. *Id.* at 567-68. Ultimately, as with most postings to the internet, this discussion group made its way into the school and Kowalski was punished. Kowalski argued that she could not be disciplined for speech that took place at home after school. The Fourth Circuit disagreed, noting "schools have a 'compelling interest' in regulating speech that interferes with or disrupts the work and discipline of the school, including discipline for student harassment and bullying." *Id.* at 572. The Court continued that "schools have a duty to protect their students from harassment and bullying in the school environment . . . [S]chool administrators must be able to prevent and punish harassment and bullying in order to

provide a safe school environment conducive to learning." *Id.* "Moreover, had the school not intervened, the potential for continuing and more serious harassment of [the initially targeted student and others] was real. Experience suggests that unpunished misbehavior can have a snowballing effect, in some cases resulting in 'copycat' efforts by other students or in retaliation for the initial harassment." *Id.* at 574. The court noted that the group consisted predominantly of students, the group was named S.A.S.H. for "Students Against Slut Herpes," the dialogue foreseeably took place between students and impacted the school environment, and the group thread was understood by the victim as an attack "made in the school context." *Id.* at 573. Based on this, the Court noted a sufficient nexus between Kowalski's speech and the school's pedagogical interest to justify the action taken by the school. *Id.* at 573.

    c. *Application of the Two Tests*

The facts involved in the present case satisfy both the Reasonable Foreseeability Test and the Nexus Test. Plaintiffs directed a racist Snapchat video to another student in the school community. As shown by *S.J.W.*, 696 F.3d at 777, even attempts to hide postings by registering domains in other countries is insufficient to avoid the Reasonable Foreseeability Test. As one district court has noted, "it is common knowledge that little, if anything, posted online ever stays a secret for very long, even with the use of privacy protections." *Shen v. Albany Unified Sch. Dist.*, No. 3:17-cv-02478-JD, 2017 WL 5890089, at *7 (N.D. Cal. Nov. 29, 2017). Both the Fourth and Ninth Circuits note that it is reasonably foreseeable that when speech is directed at others in the school community, that the speech might reach the school. *Wynar*, 728 F.3d at 1069; *Kowalski*, 652 F.3d at 572.

Similarly, the facts present in this case also satisfy the Nexus Test utilized by the Fourth Circuit. In *Kowalski*, the Fourth Circuit weighed the school's "compelling interest" in regulating

speech that interferes with work and discipline at the school, including harassment and bullying, with the student's interest in free speech. 652 F.3d at 572. "Far from being a situation where school authorities suppress speech on political and social issues based on disagreement with the viewpoint expressed, school administrators must be able to prevent and punish harassment and bullying in order to provide a safe school environment conducive to learning." *Id.* (citation omitted). It is important to note that Plaintiffs' speech is not political or social; it projects hate and is likely to create a hostile environment for students, especially African American students. This is true even if Plaintiffs' original intent was not to harass or bully the recipient. Few words, if any, in the English language carry the negative connotation that the n-word does. Unlike other slurs, it is perhaps the only one so vile that it has been truncated to a single letter.: "N-," known by some as the nuclear bomb of racial epithets. When the school learned that students had sent a video using this word to another student and that it spread within the school community (including the families of students), the school's interest in preventing further damage to the community cannot be overstated. Weighing the interests of Plaintiffs being able to use the n-word and send videos containing that word to other students against the compelling interest protect students and promote a safe learning atmosphere, Defendants submit a sufficient nexus exists between the speech and the interests being protected.

    2. <u>Plaintiffs' Suspension From Extracurricular Activities Is Constitutional Under *Tinker*.</u>

Once it is determined that a school can regulate off-campus speech, the court should apply *Tinker* to evaluate the constitutionality of the school's imposition of discipline. Initially, the use of the n-word and referring to "picking cotton" are the type of highly offensive comments that are not granted First Amendment protections in the public-school context. This was made clear by the Supreme Court in *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) nearly 35 years ago.

In *Fraser*, a high school student gave a speech at an assembly nominating a fellow student for an elective office. *Id.* at 677. During his speech, the student "referred to his candidate in terms of an elaborate, graphic, and explicit sexual metaphor." *Id.* at 677-78. During the speech, a counselor noted some students "hooted and yelled," while others appeared bewildered and embarrassed. *Id.* at 678. One teacher reported the following day she had to forgo a portion of her class to discuss the speech. *Id.* The student was suspended for three days and removed from the list of candidates for graduation speaker. *Id.* The student filed suit raising First Amendment protections. *Id.*

The District Court found the sanctions violated the student's free speech under the First Amendment and the school's disruptive-conduct rule[2] was unconstitutionally vague and overbroad and that the removal of the student from the list of possible speakers violated the Due Process Clause of the Fourteenth Amendment. *Id.* at 679. The Court of Appeals for the Ninth Circuit affirmed the judgment of the District Court, 755 F.2d 1356 (1985), holding that respondent's speech was indistinguishable from the protest armband in *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The court explicitly rejected the School District's argument that the speech, unlike the passive conduct of wearing a black armband, had a disruptive effect on the educational process. The Supreme Court reversed the Ninth Circuit and found that the school did not violate the student's rights.

The Supreme Court first acknowledged that in *Tinker*, it previously found that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 680. But, the Supreme Court noted that the Ninth Circuit treated the lewd language as essentially the same as the passive expression of a political viewpoint as in *Tinker*. *Id.* The Court

---

[2] The school's disciplinary rule prohibiting the use of obscene language in the school provides: "Conduct which materially and substantially interferes with the educational process is prohibited, including the use of obscene, profane language or gestures."

found that the two types of speech were distinguishable and that lewd or offensive language was not accorded the same protections as political speech. *Id.* The Court explained:

> Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse. Indeed, the "fundamental values necessary to the maintenance of a democratic political system" disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the "work of the schools." *Tinker,* 393 U.S., at 508, 89 S.Ct., at 737; see *Ambach v. Norwick, supra.* The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.
>
> The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order. Consciously or otherwise, teachers—and indeed the older students—demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class. Inescapably, like parents, they are role models. The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by this confused boy.

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986).[3] The Court also noted that it has previously recognized "an interest in protecting minors from exposure to vulgar and offensive spoken language." *Id.* at 684. In the context of *Fraser*, the Supreme Court found that "it was perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education." *Id.* at 685-86.

---

[3] After *Fraser*, the Supreme Court found that *Fraser's* analysis was not complete because it did not conduct the "substantial disruption" analysis. *Morse v. Frederick*, 551 U.S. 393, 394 (2007)(noting that in *Tinker*, student expression may not be suppressed unless school officials reasonably conclude that it will "materially and substantially disrupt the work and discipline of the school.")

The Supreme Court also overruled the Ninth Circuit and found that the Due Process Clause was not violated. The Supreme Court found no merit in the argument that the student did not know that his speech would subject him to disciplinary sanctions because the school policy was too vague. *Id.* at 686. The Supreme Court held that "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Id.* (citation omitted). Based on the foregoing, there is no doubt that if Plaintiffs' used the same hateful language during a school event, the First Amendment would not protect them.

Plaintiffs recognize the uncertainty in the law on this issue and suggest that if out-of-school conduct can be sanctioned, it must "materially and substantially disrupt the work and discipline of the school." Contrary to Plaintiffs' conclusion that the video did not materially or substantially interfere with school activities, the video that circulated to other students and parents from the school caused serious disruption. *Tinker* does not require certainty that a disruption will occur, only a reasonable forecast of a substantial disruption. *Barr v. Lafon*, 538 F.3d 554, 565 (6th Cir. 2008); *Lowery v. Euverard*, 497 F.3d 584, 592 (6th Cir.2007). "According to a federal government initiative, student-on-student bullying is a 'major concern' in schools across the country and can cause victims to become depressed and anxious, to be afraid to go to school, and to have thoughts of suicide. *See* StopBullying.gov, available at www.stopbullying.gov (follow "Recognize the Warning Signs" hyperlink)." *Kowalski*, 652 F.3d at 572. Although Plaintiffs may argue that the video was not meant to harass or bully, it is reasonable to conclude that the video could create a hostile environment. "[S]chools have a duty to protect their students from harassment and bullying in the school environment[.]" *Id.* (citing *Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir.2007))

("School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place").

The Sixth Circuit has further defined this duty specifically in respect to athletics. *See Lowery*, 497 F.3d at 596) (citing *Wildman v. Marshalltown*, 249 F.3d 768, 771 (8th Cir. 2001)). Initially, participation in high school sports is a privilege, not a right. In Tennessee, like the majority of jurisdictions, the right to participate in athletics is considered to be "a mere privilege." *Tenn. Secondary Sch. Athletic Ass'n v. Cox*, 221 Tenn. 164, 425 S.W.2d 597, 602 (1968) (citations omitted); *Wingad v. Tenn. Secondary Sch. Athletic Ass'n*, No. 02A01–9111CH00275, 1992 WL 213380, at *4 (Tenn.Ct.App. Sept. 4, 1992) (citation omitted). Because there is no legal right to participate in sports, participation in interscholastic athletics is deemed to "fall[ ] outside the protection of the due process clause of the Fourteenth Amendment." *Wingad*, 1992 WL 213380, at *4. Furthermore, in the context of athletics, the Sixth Circuit has noted that the above mentioned duty extends to creating an environment conducive to unity and sportsmanship, and further, one that is free of disruptions that would rip away at the team's cohesiveness. *Id.* Here, it absolutely cannot be said that a racially divided locker room for a high school football team is one that is exudes unity. Thus, Plaintiffs' position puts the school in an impossible dilemma. By their standard, the school must either sit idly by as a racially charged video circulates the student body and continue to allow those students' presence to disrupt the locker room and distress minority students or it must act on behalf of the students that count it to respond to events like this and suddenly be held liable for a constitutional violation. The Sixth Circuit has expressly decided that this situation would be "disastrous public policy" and furthermore, that nothing in *Tinker* requires this result. *Lowery*, 497 F.3d at 596.

Furthermore, the Supreme Court has admonished lower courts that it is improper for "courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)). School officials are not required to cede control of the school to students simply by virtue of the proverbial, "I can say what I want because I have free speech" saying. *See Fraser*, 478 U.S. at 686 (quoting *Tinker*, 686 U.S. at 526 (Black, J. dissenting)(noting that there is no part of the "Federal Constitution [that] compels the teachers, parents, and elected school officials to surrender control of the American public school system to public school students."). The Sixth Circuit has further noted that to threaten this top-down model of school authority is to "threaten the mission of the public-school system." *Lowery*, 497 F.3d at 588.

The substantial disruption that Plaintiffs' video had on the educational environment is explained in the declarations submitted by Director Donna Wright and Coach Perry. These are summarized as follows:

- Upon learning of the video, the administration had to conduct an investigation, which took up valuable time and resources that could otherwise be utilized to focus on student development (Wright Declaration, ¶¶ 7-8);

- The administration was concerned that the hate speech contained in the videos could potential create tension among students and student athletes and might possibly lead to verbal and possibly physical confrontations (Wright Declaration, ¶ 7);

- The administration received numerous complaints from parents and news media inquiries (Wright Declaration, ¶ 4, 9);

- Multiple meetings were held with the football team to ensure unity and fellowship and to address racism and how it affects the team (Perry Declaration, ¶¶ 6, 7 and 9).

It is difficult to determine the affect that such hateful speech can have on the school's student body and teachers, especially when the speech comes from another student, but these facts establish that considerable time and energy went into curtailing the negative effects of the speech.

### B. Irreparable Injury in Absence of a Preliminary Injunction

Because in the First Amendment context, likelihood of success on the merits is paramount, and as stated above Plaintiffs cannot prove they are likely to succeed on the merits, this Court should deny the motion for a preliminary injunction. Additionally, Defendants acknowledge that losing the ability to play football for a few games while Plaintiffs seek a permanent injunction can cause some damage. But, this is not the type of irreparable injury that requires an injunction. *See Matthews v. Nat'l Collegiate Athletic Ass'n*, 79 F. Supp. 2d 1199, 1208 (E.D. Wash. 1999) ("Missing the chance to play in three football games is not the type of irreparable injury contemplated by the award of a preliminary injunction.")

### C. Substantial Harm to Others Caused by Preliminary Injunction

If this Court grants a preliminary injunction and Plaintiffs are allowed to at least temporarily avoid punishment for the video, this could have a detrimental effect on the District's ability to discipline and control the use of racially insensitive speech. School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place. The Supreme Court "has repeatedly emphasized that need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker*, 393 U.S. at 507. "Without first establishing discipline and maintaining order, teachers cannot begin to educate their students." *New Jersey v. T.L.O.*, 469 U.S. 325, 350 (1985) (Powell, J., concurring).

An injunction in this case would: (1) cause students fear and apprehension knowing that the District could do nothing to punish the hateful speech and hostile school environments; (2) allow students to subvert explicit rules and policies; (3) allow the use of the n-word; (4) undermine the school's ability to teach character, communication, and social responsibility; (5) create discord among members of the football team and student body; and (6) tacitly condone racism.

### D. Public Interest Not Served by a Preliminary Injunction

Because the punishment in this case constitutes a valid exercise of the District's power to discipline and enforce its policies and does not impermissibly burden a constitutional right, the issuance of a preliminary injunction fails to serve the public interest.

Respectfully submitted,

*/s/ W. Carl Spining*
W. Carl Spining (#016302)
330 Commerce Street, Ste. 110
Nashville, TN 37201
(615) 256-9999
cspining@ortalekelley.com

# CERTIFICATE OF SERVICE

  I hereby certify that on July 31, 2020, a true and correct copy of the foregoing Response has been served through the Court's CM/ECF website upon the attorney of record for the Plaintiffs:

G. Jeff Cherry, Esq.      jcherry@lowreylaw.com
Christopher Beauchamp, Esq.    cbeauchamp@lowreylaw.com
150 Public Square
Lebanon, Tennessee 37087

David L. Hudson, Jr., Esq.    davidhudsonjr@gmail.com
PNC Law
615 Main Street, Suite 102
Nashville, Tennessee 37206

             */s/ W. Carl Spinning*
             W. Carl Spinning